IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>ALBERTO GIOVANNI ZAMORA, and<br>JUAN JESUS NAVA,<br><br>Defendants. | **4:17CR3109**<br><br>**FINDINGS RECOMMENDATION AND ORDER** |

Pending before the court are Motions to Suppress filed by Defendants Alberto Giovanni Zamora, (Filing No. 47), and Juan Jesus Nava. (Filing No. 45). Zamora and Nava seek to suppress all evidence obtained as a result of the August 25, 2017 traffic stop and search of their vehicle. For the following reasons, Defendants' motions should be denied.

BACKGROUND

After hearing testimony and reviewing the documentary, audio, and video evidence, the undersigned magistrate judge finds the following facts are credible.

On August 25, 2017, Sergeant Mike Vance of the Seward County Sheriff's Office was patrolling traffic while travelling eastbound in the passing lane on Interstate 80 near mile marker 376 in Seward County. Vance observed a black four-door, Lincoln Town Car vehicle with California plates traveling eastbound less than one car-length behind a semi tractor-trailer truck at a speed of approximately 74 miles per hour. Vance also observed that the Lincoln's windows were tinted so dark that he was unable to see inside the vehicle. Vance

believed the Lincoln was following too closely behind the semi and pulled behind the Lincoln, intending to follow and effectuate a traffic stop.

The Lincoln then changed lanes from the outside travel lane to the inside passing lane. Vance changed lanes following the Lincoln. After the Lincoln and Vance's cruiser passed several other vehicles in the passing lane, the Lincoln then changed lanes cutting in-between two semi trucks and began following the lead semi too closely.[1] Vance believed the driver of the Lincoln might be changing lanes in an attempt to circumvent Vance's ability to perform a traffic stop on the Lincoln. After a time, Vance was able to safely pull behind the Lincoln, activate his lights, and stop the Lincoln when it pulled into a rest area near mile marker 380.

Vance approached the passenger side of the Lincoln, and spoke to the driver, Nava, who identified himself with a California ID card. Nava said he did not have a driver's license. While he was at the window of the car, Vance smelled a slight odor of burnt marijuana coming from the vehicle. He also saw three cell phones lying in the vehicle and air fresheners. Vance explained that he pulled the Lincoln over for following too closely. Nava said he knew, and he was moving out of the way of traffic. Vance then contacted the front seat passenger, Zamora, who identified himself with a California ID. He also denied having a driver's license.

Vance asked Nava to come back to his cruiser while he completed issuing a warning. While in the cruiser, Vance discussed Nava and Zamora's travel plans

---

[1] The video recording of Sergeant Vance's stop begins shortly before his car lights were activated while the Lincoln was traveling between the two semis. Vance testified that he did not start his lights and attempt to effectuate the stop earlier while following the Lincoln in the passing lane because the inside curb was not large enough to safely conduct a traffic stop.

with Nava. Nava said they were traveling to Chicago and would be staying for a week. Nava remained very nervous while sitting in the cruiser: Vance observed Nava continually bite his lips and cheeks and was able to see Nava's carotid artery clearly pulsing.

Vance returned to the Lincoln to verify the vehicle identification number ("VIN"). While there, he talked to Zamora who was walking freely about the rest stop. Zamora said he had owned the car for six months. He said they were going to Chicago to see a baseball game and would be staying for four days.

Vance returned to the cruiser. He received notification from the E-911 center that Nava had a prior criminal record which included drug-related crimes. Vance then explained the warning to Nava, handed it to him, and told Nava he was free to go. As Nava began to exit the cruiser, Vance asked if Nava would answer some additional questions. Nava agreed. (Gov. Exh. A at 11:11). Vance asked if Nava had any weapons, large amounts of money, or drugs in the car. After each individual question, Nava answered in the negative, looking amused and vigorously shaking his head "no" each time. Vance then asked Nava if he could search the car. Nava responded "yea, that's fine, yea sure." (Gov. Exh. A at 11:24). Vance approached Zamora outside of the vehicle and asked for consent to search the Lincoln as it was Zamora's vehicle. Zamora quickly responded "go ahead, go ahead," nodding and gesturing toward the vehicle. (Gov. Exh. B at 11:40).

Vance searched the car. He found marijuana shakings (marijuana leaf or seed fragments) on the floor of the passenger compartment as well as in the center console. He discovered several receipts from purchases made in Mexico on August 20, 2017, and August 21, 2017. Vance noticed that the carpet was not

factory carpet and appeared to have been recently installed. He also noticed the seats appeared to had been removed and replaced and there was an unusual hump on the floor of the vehicle under the carpet. In addition, Vance noticed the car had been painted, and the original color appeared to be burgundy. Vance noticed the bolts which hold the windshield wipers on the vehicle were scarred, indicating they had recently been removed. The molding around the windshield had not been correctly replaced, was not straight, and was sticking up at the top corners, indicating it had been removed and was not replaced by a professional. Vance noticed a stick was needed to hold the hood up because the hood lift support shocks had been removed.

Vance talked to Zamora and told him he suspected that there was an after-market hidden compartment in the Lincoln and that he wanted to have the car towed so that it could be further searched. Vance asked Zamora if that was alright with him. Zamora looked skeptical, but did not deny that there was an after-market compartment in the Lincoln. Instead, Zamora shrugged his shoulders and said "alright" and then further added "yea, go ahead." (Gov. Exh. B at 36:20–36:56).

Zamora then told Vance he had been stopped for speeding in western Nebraska. He said the state trooper had searched the car and did not find anything. Zamora said the trooper gave them directions to the nearest Western Union so they could have someone wire them gas money because they were almost out.

The Lincoln was towed to a shop location for further search. Zamora and Nava were also transported to that location. They were not handcuffed. After arriving at the shop, they sat in a room next to the area where the search was

4

being conducted with the door open between those two areas. During the search at the shop, 15 taped packages were found within a void space behind the firewall. A pre-test of the contents of one of the packages was positive for the presence of heroin. Both Zamora and Nava were then placed under arrest.

Nava and Zamora now challenge the stop and search of the Lincoln, arguing the stop was not supported by probable cause and their detention was unlawfully prolonged in violation of Rodriguez v. United States, 135 S. Ct. 1609 (2015). Defendants argue Vance did not have the necessary reasonable suspicion to extend the stop beyond the activities necessary to issue the warning ticket. Accordingly, the defendants request that all evidence be suppressed as fruit of an illegal search and seizure.

## ANALYSIS

A traffic stop is legal if it is supported by probable cause to believe that a law violation has occurred. Whren v. United States, 517 U.S. 806, 810 (1996). "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation. This is true even if a valid traffic stop is a pretext for other investigation." United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (internal quotations omitted). A traffic stop "is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008) (quoting United States v. Chatman, 119 F.3d 1335, 1339-40 (8th Cir. 1997)). An officer's subjective motivations for a stop are not relevant where a traffic violation has occurred. Long, 532 F.3d at 795.

Following a vehicle more closely than is "reasonable and prudent" is a violation of Nebraska law. Neb. Rev. Stat. Ann. § 60-6,140. And an officer can lawfully stop a vehicle for traveling too closely even if the officer intends to issue only a warning ticket. United States v. Neumann, 183 F.3d 753, 755 (8th Cir. 1999); United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998). Additionally, in the state of Nebraska, it is unlawful for a registered vehicle to have its windows tinted "so that . . . the ability to see into the motor vehicle is substantially impaired." Neb. Rev. Stat. Ann. § 60-6,257(1)(a). However, a traffic stop may be invalid if the officer causes or contributes to the traffic violation for which the vehicle is stopped. See United States v. Ochoa, 4 F.Supp.2d 1007 (D. Kan. 1998).

When Vance first observed the Lincoln, he saw it was following less than a second behind a semi while travelling approximately 74 miles per hour. Although Vance did not use any objective measurements beyond his own eyesight, later while he was attempting to follow the Lincoln, Vance saw the Lincoln following a semi so close that there was not be enough room for Vance to pull his own vehicle between the two. Under the facts presented, Vance had probable cause to stop Defendants' vehicle for following too closely.

Defendants imply Vance would not have stopped the RV but for the California license plate. Even if true, Vance's subjective motivation, including his decision to stop Defendants' vehicle while ignoring violations committed by other drivers, is irrelevant. Sallis, 507 F.3d at 649. Vance's observation of the Lincoln following another vehicle too closely provided probable cause for the stop.

Nava and Zamora argue Sergeant Vance caused or contributed to the traffic stop by following their vehicle while in fairly heavy traffic. They argue Nava was forced to pull between the two semis in an effort to allow Vance to pass.

The court is not persuaded that Nava was "forced" into pulling between the two semis simply because Vance was following the Lincoln in his cruiser. And even if Nava felt getting out of the way was necessary, he could have pulled the Lincoln safely onto the shoulder or waited until he was ahead of the lead semi instead of changing lanes and thereby sandwiching his vehicle between the semis and too close behind the lead semi. Regardless, the defendants' argument only accounts for the second time that Vance witnessed the Lincoln following too closely. Before the video recording began, the Lincoln was following another semi too closely. Accordingly, the court finds that Vance had probable cause to effect a traffic stop on the Lincoln.

Once a stop is initiated, "it should last no longer than is necessary to dispel the officer's suspicions." Long, 532 F.3d at 795 (citing United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001)). "[A] reasonable investigation of a traffic stop may include . . . requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose" of the trip. United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994) (citing United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993); United States v. Richards, 967 F.2d 1189, 1193 (8th Cir. 1992)). And an officer may verify the information provided by the driver by questioning other occupants of the vehicle. United States v. Foley, 206 F.3d 802, 805 (8th Cir. 2000) (citing United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995)). A reasonable stop may also include completing "a number of routine but somewhat time-consuming tasks[,]" including "checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning."

7

United States v. Barragan, 379 F.3d 524, 528–29 (8th Cir. 2004). Once this initial investigation and the purpose of the stop are complete, further detention is unreasonable, "'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention'" United States v. Flores, 474 F.3d 1100, 1103 (8th Cir. 2007) (quoting Jones, 269 F.3d at 925).

Reasonable suspicion exists if the officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[s] suspicion that a crime [is] being committed." United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998)(citations omitted). The court looks to the totality of the circumstances when determining whether reasonable suspicion exists. Id. "[B]oth innocent and criminal acts can create reasonable suspicion." United States v. Juvenile TK, 134 F.3d 899, 903 (8th Cir. 1998) (citing United States v. Sokolow, 490 U.S. 1, 9 (1989)). Whether certain acts contribute to a finding of reasonable suspicion is determined by viewing them in light of the law enforcement officer's experience and training. United States v. Condelee, 915 F.2d 1206, 1209 (8th Cir. 1990)(internal citations omitted); Beck, 140 F.3d at 1136. However, the officer's suspicion cannot be based on a mere hunch or circumstances which "describe a very large category of presumably innocent travelers." Condelee, 915 F.2d at 1209 (citing Reid v. Georgia, 448 U.S. 438, 440–41 (1980)).

Throughout the stop, Vance asked Nava to sit his cruiser, asked Nava about their travel plans, sought verification of this information from Zamora, checked the VIN number, requested a criminal history check for Nava, and prepared and issued the warning for following too closely. After completing these tasks, Vance believed he had at least reasonable suspicion to run his canine, Igor, around the Lincoln.

Vance has approximately 31 years of law enforcement experience, including many years working for and supervising narcotics task forces and canine units, and at least 11 years in supervising Seward County officers. With his training and experience, Vance considered multiple aspects of the traffic stop including:

1.   The odor of burnt marijuana emanating from the vehicle upon Vance's initial approach.

2.   The multiple cell phones located on the dash of the vehicle. Vance knows from his training and experience that people involved in narcotics trafficking often carry multiple cell phones.

3.   The presence of air fresheners in the vehicle which in Vance's experience are used to mask or hide the odor of illegal drugs.

4.   Inconsistent answers from Zamora and Nava concerning their travel plans.

5.   Nava's continued nervous demeanor, including biting his lip and cheek, even after being informed he would receive only a warning.

6.   Nava's past criminal history including drug offenses.

Considered in the totality, these facts created a reasonable suspicion that Defendants were involved in criminal activity—likely drug trafficking. See, e.g., United States v. Pena-Ponce, 588 F.3d 579, 584 (8th Cir. 2009) (finding that extreme nervousness, multiple cellphones, and inconsistent stories generated reasonable suspicion); Jones, 269 F.3d at 929 (explaining that nervousness combined with other more revealing facts can generate reasonable suspicion).

Even if the court did not find reasonable suspicion existed to extend the encounter beyond writing a warning and performing a criminal history check, the Fourth Amendment allows an officer to ask additional questions with the consent of the individual, and to request consent to search the vehicle and extend the encounter to perform a consent search. See Flores, 474 F.3d at 1103–04 (requesting permission to ask additional questions after suspect is told he is free to leave does not violate the Fourth Amendment); Long, 532 F.3d 791 at 795 (asking for consent to search after the purpose of a stop has concluded and suspicion has been dispelled does not violate the Fourth Amendment).

At the conclusion of the traffic stop, Vance handed Nava the warning ticket and documents, told Nava that the stop was complete, and advised him that the defendants were free to leave. Vance remained seated in the cruiser, and as Nava began to exit, Vance asked if Nava would answer some additional questions. Nava stopped exiting the cruiser, replied that he would answer additional questions, and then answered Sergeant Vance's questions. This conduct by Vance did not unlawfully expand the stop. See Flores, 474 F.3d at 1103–04.

Immediately after asking the questions, Vance sought Nava's consent to search the Lincoln. Nava again responded in the affirmative. Vance then asked Zamora, the vehicle owner, for consent to search the Lincoln. Zamora consented. Just as above, seeking consent to search the vehicle and consequently searching the vehicle after receiving consent did not unlawfully expand the stop. See Long, 532 F.3d 791 at 795.

Consensual searches are reasonable under the Fourth Amendment. Florida v. Jimeno, 500 U.S. 248, 250–51 (1991). But consent must be knowing

and voluntary. The government has the burden of proving by a preponderance of the evidence that Defendant's consent to search was freely given. United States v. White, 81 F.3d 775, 780 (8th Cir. 1996). In determining whether this burden is met, the court considers the totality of the circumstances, including both the characteristics of the accused and the environment in which the consent was given. United States v. Griffith, 533 F.3d 979, 984 (8th Cir. 2008) (citing United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990)). When assessing the voluntariness of a consent, suspect characteristics which may be relevant include:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their Miranda rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

Griffith, 533 F.3d at 984. Relevant environment characteristics include:

> [W]hether the person who consented: (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) objected to the search or stood silently by while the search occurred.

Griffith, 533 F.3d at 984. These factors are not to be applied mechanically, but serve as a guide.

As evidenced by the videos, (See Gov. Exhs. A & B), both defendants gave very clear and unambiguous verbal and nonverbal consent to search the vehicle. They were not coerced or pressured to provide this consent. Nava's encounter with Vance in the vehicle was brief, but friendly, and Nava had just

been informed that he was free to go prior to providing consent to search. Before granting consent to search, Zamora was either walking around freely throughout the public rest area facilities or relaxing under a tree. Defendants had prior experience with law enforcement: Nava had a prior criminal record, and earlier in the trip, the defendants had submitted to a search of the Lincoln. The court finds under the totality of the circumstances, both defendants provided knowing and voluntary consent for Sergeant Vance to search the Lincoln. Accordingly, the defendants' detention was not unlawfully prolonged during the resulting search of the vehicle.

Defendant Zamora additionally challenges the second consent and further detention for the continued search of the Lincoln.

The government argues that based on Sergeant Vance's training and experience, he had at least reasonable suspicion, if not probable cause, to extend the detention and search the Lincoln further following the initial search. Additional to the facts provided above, the initial search uncovered or confirmed the following facts:

1. Numerous details of the vehicle indicated that the Lincoln had been altered in a manner consistent with hiding criminal drug activity from police enforcement, including:

    - The vehicle had been recently painted,
    - new carpet had been installed,
    - the seats appeared to have been removed and replaced,
    - there was an unusual hump on the vehicle floor,
    - there was scarring on the windshield wiper bolts, and
    - the molding around the windshield appeared to have been removed and replaced incorrectly/not by a professional.

    Each of these factors indicated to Sergeant Vance that the Lincoln had been altered and then reconstructed. Less than two months

12

prior, Vance had been involved in a traffic stop of another vehicle of the same make and model exhibiting many of the same minor alterations. This other Lincoln was found to have a hidden, after-market compartment.

2.      The hood lift shocks were removed on one side, a tactic used to keep law enforcement officers from spending time looking in the engine compartment for illegal items.

3.      Marijuana shakes were found on the carpet and center console.

4.      Law enforcement found receipts dated August of 2017 from Mexico, a known drug source location, in the Lincoln.

5.      Zamora mentioned that when they were in Western Nebraska, they were wired money because they were almost out of money for gas. Vance found it suspicious that the defendants had already ran out of money as the defendants both claimed they were going to Chicago for at least four days.

A warrantless search of an automobile for contraband is allowed under the Fourth Amendment if an officer has probable cause to justify the search. United States v. Ross, 456 U.S. 798, 825 (1982). Observations made and "information gathered during a consensual search can provide probable cause to search a vehicle more thoroughly or even to arrest its occupants." United States v. Martel-Martinez, 988 F.2d 855, 859 (8th Cir. 1993) (citations omitted); United States v. Guevara, 731 F.3d 824, 829–31 (8th Cir. 2013). Alterations to vehicles indicating hidden compartments found during an initial search, along with other factors, can provide the probable cause necessary for a further, and often more intrusive, warrantless search. See Martel-Martinez, 988 F.2d at 859; Guevara, 731 F.3d at 829–31 (concluding officers had probable cause to conduct a destructive search of engine of a lawfully stopped vehicle because the officers discovered a hidden compartment when conducting the initial consensual search); United States v. Murillo-Salgado, 854 F.3d 407, 418 (8th Cir. 2017); United States v. Price, 869

F.2d 801, 804 (5th Cir. 1989) (finding presence of secret compartment supported probable cause to search); United States v. Nicholson, 17 F.3d 1294, 1298 (10th Cir. 1994) (holding truck alteration indicating a hidden compartment contributed to a finding of probable cause for further search); United States v. Flores, 368 Fed. Appx. 424 (4th Cir. 2010).

Based on his prior training and experience, the numerous vehicle alterations observed by Sergeant Vance during the initial consensual search indicated the presence of a hidden after-market compartment in the Lincoln. This fact, along with the numerous factors provided above—the odor of marijuana, marijuana shakes, recent receipts from Mexico, and multiple cell phones—provided Vance with probable cause to conduct a further, and potentially more intrusive, vehicle search and to extend the defendants' detention.

Additionally, the court notes that regardless of the probable cause finding, after the initial search, Zamora again provided clear verbal and nonverbal consent to tow the Lincoln and search for an after-market hidden compartment. Zamora did not deny that an after-market compartment existed nor did he appear pressured into consenting to the further search.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable John M. Gerrard, United States District Judge, pursuant to 28 U.S.C. § 636(b), that the motions to suppress filed by Defendants Nava and Zamora (Filing Nos. 45 & 47) be denied in their entirety.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED that the jury trial of this case is set to commence before John M. Gerrard, United States District Judge, in Courtroom 1, United States Courthouse, Lincoln, Nebraska, at 9:00 a.m. on January 16, 2018 or as soon

thereafter as the case may be called, for a duration of three (3) trial days. Jury selection will be held at the commencement of trial.

Dated this 19th day of December, 2017.

BY THE COURT:
*s/ Cheryl R. Zwart*
United States Magistrate Judge